UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES R. HARRIS,

                Plaintiff,                    Case No. 2:15-cv-13435
                                              Judge Nancy G. Edmunds
v.                                       Magistrate Judge Anthony P. Patti

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AS MODIFIED AT THE NOVEMBER 4,
2016 HEARING (DE 10) and GRANT DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (DE 12)**

**I.**      **RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary

judgment as modified at the November 4, 2016 hearing (DE 10), **GRANT**

Defendant's motion for summary judgment (DE 12), and **AFFIRM** the

Commissioner's decision.

**II.**      **REPORT**

      Plaintiff, James Russele Harris, brings this action under 42 U.S.C. § 405(g)

for review of a final decision of the Commissioner of Social Security

("Commissioner") denying his applications for disability insurance (DI) and

supplemental security income (SSI) benefits.  This matter is before the United

1

States Magistrate Judge for a Report and Recommendation on Plaintiff's motion for summary judgment (DE 10), the Commissioner's cross motion for summary judgment (DE 12), Plaintiff's reply (DE 14), the parties' supplemental briefs (DEs 18, 19 and 20), and the administrative record (DE 7).

### A.     Background

#### 1.     The June 1, 2010 hearing

Plaintiff filed his applications for DI and SSI benefits on February 11, 2009, alleging that he has been disabled since January 1, 2001, at age 54.  (R. at 220-223, 224-225.)  Plaintiff alleges disability as a result of glaucoma, diabetes, blindness and hypertension.  (R. at 254.)  His applications were denied on February 18, 2009 and April 17, 2009.  (R. at 80, 103-106, 107-111.)

On June 24, 2009, Plaintiff sought a *de novo* hearing before an Administrative Law Judge ("ALJ").  (R. at 112-117, 118-119.)  ALJ Grippo held a hearing on June 1, 2010, at which Plaintiff was represented by counsel.  (R. at 72-79.)  On October 5, 2010, ALJ Theodore W. Grippo found that Plaintiff was not disabled under the Social Security Act.  (R. at 81-94.)

#### 2.     The June 17, 2013 hearing

On July 16, 2012, the Appeals Council remanded the case to the ALJ.  (R. at 95-98.)  ALJ Grippo held a hearing on June 17, 2013, at which Plaintiff was again represented by counsel.  (R. at 33-71.)  *At this hearing, the issue was "whether*

*there is objective, contemporaneous medical evidence that the claimant's condition met a listing for blindness, as of December 31, 2006[.]"* (R. at 38 (emphasis added).) On April 15, 2014, ALJ Grippo determined that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 10-32.)

Plaintiff requested review of the hearing decision. (R. at 8-9.) On July 31, 2015, the Appeals Council denied Plaintiff's request for review. (R. at 1-7.) Thus, ALJ Grippo's decision became the Commissioner's final decision.

Plaintiff then timely commenced the instant action on September 29, 2015. (DE 1.)

### B.    Plaintiff's Medical History

Plaintiff alleges in the February 11, 2009 field office disability report that he has been disabled since January 1, 2001. (*See* R. at 240-242.) His 127 pages of medical records span the near-14 year period from January 20, 2000 to January 9, 2014. (R. at 374-500 [Exhibits 1F-16F].) Plaintiff's medical records will be discussed in further detail as necessary below.

### C.    Hearing Testimony

ALJ Grippo conducted the initial hearing on June 1, 2010, at which Plaintiff and VE Harry Cynowa testified. (R. at 72-79; *see also* R. at 151-152.) ALJ Grippo conducted the subsequent hearing via video teleconference on June 17, 2013, at which Dr. Leslie Ira Siegel (of the Glaucoma Center of Michigan) and Dr.

3

Robert Taub testified.  (*See* R. at 33-71; *see also* R. at 461.)[1]  At each hearing,

Plaintiff was represented by attorney James Craven, III.  (R. at 74, 35.)  I will

forego further summary of the testimony for the time being and only mention it as

necessary below.

### D.    The Administrative Decisions[2]

ALJ Grippo issued his initial decision on October 5, 2010 (R. at 81-94.)  At

**Step 1**, he determined that Plaintiff did not engage in substantial gainful activity

during the period from his alleged onset date of January 1, 2001 through his date

---

[1] Also present at this hearing was VE Brian L. Harmon, M.A., C.R.C.  (R. at 35, 216-217, 362-365.)

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

   1.    Is the claimant engaged in substantial gainful activity?
   2.    Does the claimant suffer from one or more severe impairments?
   3.    Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
   4.    Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
   5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

last insured of December 31, 2006.  (R. at 86.)  At **Step 2**, the ALJ determined that Plaintiff had the medically determinable impairment of glaucoma; however, the ALJ also determined that it was not severe.  (R. at 86, 87-93.)  In so doing, the ALJ noted that Plaintiff did not meet the definition of statutory blindness (*i.e.*, listings 2.02 or 2.03A) *prior to the alternative date last insured of December 31, 2006*.  (R. at 88.)

ALJ Grippo issued his subsequent decision on April 15, 2014 (R. at 10-32.) In sum, he concluded that Plaintiff was not statutorily blind through December 31, 2006, because the impairment did not meet the requirements of listing 2.02 or listing 2.03A.  (R. at 16-26.)

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence

but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the

6

merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651

(quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

### F.    The ALJ's opinion is supported by substantial evidence.

This Court's consideration of the pending motions began with a November

4, 2016 hearing, at which Plaintiff and his counsel were present and defense

counsel participated by phone.[3]  During the hearing, the Court was able to clarify

that, while Plaintiff *is not asserting* that he was denied due process at the June 17,

2013 hearing[4] or that 20 C.F.R. § 404.130(e) provides an alternative form of relief,

---

[3] The Commissioner was represented by Special Assistant United States Attorney
Ronald W. Makawa (MA), who is an attorney of record in this case.  (*See* DE 16.)
Plaintiff was represented by attorney James B. Craven (NC), who is not the
attorney filing papers in this case and who has not filed an appearance in this
matter.  Moreover, it does not appear as if attorney Craven has been sworn into the
E.D. Mich.  The Court did not make these observations until after the November 4,
2016 hearing.  In fact, the only Plaintiff's attorney of record in this case is Daryl C.
Royal (MI), who filed the original complaint and several other matters in this case.
(DE 1, 5, 9, 10, 13, 14, 18, 19.)  Therefore, by way of service of a copy of this
order upon him by attorney Royal, attorney Craven's attention is drawn to the
Local Rules of this Court, especially E.D. Mich. LR 83.20 ("Attorney Admission")
and E.D. Mich. 83.25 ("Attorney's Appearance").

[4] Counsel complains that his examination of Dr. Siegel was cut off by the ALJ.
(*See* DE 10 at 15-18.)  However, the portion of his examination at which this
occurred had nothing to do with the type of testing that was done; rather, in
reference to Dr. Siegel's earlier testimony that Plaintiff was "looking through a
straw[,]" (R. at 51-53) and Dr. Taub's testimony that "it doesn't make any sense at
all[,]" (R. at 67), Plaintiff's counsel's re-examination of Dr. Siegel sought to
clarify it for Dr. Taub's sake and associate Plaintiff's present vision with Dr.
Siegel's testimony that Plaintiff's "condition as of December 2006 was no better
than it is now[,]" (R. at 68-70).  Moreover, the ALJ provided counsel with not one,
but two opportunities to examine his treating physician.  (R. at 39-54 (examination

he *is arguing* that:  **(1)** he was legally blind as defined by 42 U.S.C. §§ 416(i)(1), 1382c(a)(2) (and by 20 C.F.R. §§ 404.1581, 416.981) before December 31, 2006; and, **(2)** the ALJ improperly weighed the opinion evidence in deciding otherwise. (*See* DE 10 at 18-27; *see also* DE 14 at 1-4.)  Plaintiff's counsel made clear on the record that his appeal is limited to these issues and that the only listing at issue in this appeal, is Listing 2.03A.  This confirmed the statement made in his brief that, "Heretofore he has been turned down solely on the basis of the <u>first</u> sentence of [42 U.S.C. § 1382c(a)(2) (or Listing 2.02)].  . . .

> 'An individual shall be considered to be blind…if he has central visual acuity of 20/200 or less in the better eye with the use of a correcting lens.'

"On that standard <u>alone</u>, Jim Harris *is not blind*."  (DE 10 at 25 (italics added)).[5]

In response to these arguments, the Commissioner argues that:  **(1)** substantial evidence supports the ALJ's finding that Plaintiff's impairment did not meet Listing 2.03A; and, **(2)** the ALJ properly weighed the opinions of Plaintiff's

---

of Dr. Siegel by Plaintiff's counsel), R. at 68 (re-examination of Dr. Siegel by Plaintiff's counsel).)  Plaintiff's counsel did not use either of these opportunities to make a record as to whether the visual field tests administered were in compliance with Social Security Administration regulations.

[5] There is ample record evidence of Plaintiff's left/better eye testing significantly better than 20/200 before and after the date last insured, especially after he had cataract surgery, as confirmed by Dr. Siegel, upon whom Plaintiff relies (R. at 50-53, opining that his left eye acuity "obviously could not meet that criteria because his vision could be improved to…20/30, 20/40 somewhere in that range in his left eye" in December 2006; see also acuity readings at R. at 392 (20/40), 398 (20/50)) and as late as 2013 (see, e.g., R. at 44 (20/30), 406 (20/40), 423 (20/40)).

treating sources.  (DE 12 at 14-17, 17-23.)  The Commissioner also correctly points out that, as confirmed by Plaintiff's counsel at oral argument, "Plaintiff does not challenge the ALJ's conclusion that he did not meet Listing 2.02 (P. Br. 23 [DE 10 at 25]), and thus the issue is deemed waived."  (DE 12 at 13.)

### 1.   Substantial evidence supports the ALJ's conclusion that the vision in Plaintiff's left eye does not meet Listing 2.03A.

As noted by the ALJ, "[t]he central issue of this case is whether the claimant was statutorily blind on or before December 31, 2006."  (R. at 13.)  As the Sixth Circuit has explained, "benefits are available to qualifying wage earners who become disabled *prior to* the expiration of their insured status[.]"  *Slone v. Secretary of Health and Human Services*, 825 F.2d 1081, 1082 n.1 (6th Cir. 1987).

According to the pertinent regulations, "[y]ou have statutory blindness only if your visual disorder meets the criteria of 2.02 or 2.03A."  Listing 2.00A2c.  The ALJ, the Court and the parties apparently agree that, "[t]here is no dispute in this case regarding the claimant's vision loss in his worse right eye."  (R. at 17.)  It is only his left eye, *i.e.*, the better one, that is at issue.  As clarified at the November 4, 2016 hearing, Plaintiff argues that the vision in his left eye meets Listing 2.03A. In other words, Plaintiff claims he has "[c]ontraction of the visual field in the better eye, with . . . [t]he widest diameter subtending an angle around the point of fixation no greater than 20 degrees[.]"  Listing 2.03A (emphasis omitted).

"To determine statutory blindness based on visual field loss in your better eye (2.03A), we need the results of a visual field test that measures the central 24 to 30 degrees of your visual field; that is, the area measuring 24 to 30 degrees from the point of fixation. *Acceptable tests include the Humphrey Field Analyzer (HFA) 30-2, HFA 24-2, and Octopus 32*." Listing 2.00A6c (emphasis added). Quite significantly, the listing provides, "*[w]e will not use the results of visual field screening tests, such as confrontation tests, tangent screen tests, or automated static screening tests*, to determine that your impairment meets or medically equals a listing or to evaluate your residual functional capacity." Listing 2.00A6f (emphasis added).

At Step II of his April 15, 2014 decision, the ALJ found that "[t]he severity of the claimant's impairment did not meet the criteria of listing 2.03A." (R. at 18-21.) In so doing, the ALJ specifically referenced several documents commenting on the degree of contraction of Plaintiff's visual field, some of which were specific to his left eye:

- Dr. Herndon's September 28, 2009 statement that Plaintiff "has less than a total of 60 degrees of horizontal visual field remaining, which is in keeping with the diagnosis of legal blindness." (R. at 20, 420, 447, 483.)

- Dr. Siegel's May 11, 2010 letter that the results of Plaintiff's "screening visual field test" or "full field 120 point screening test" on his *left eye*, which revealed "less than 20-degrees." (R. at 19, 430-431; *see also* R. at 458, 493-494.)

- Dr. Siegel's June 17, 2013 testimony that Plaintiff "met [the SSA's statutory blindness] criteria in December of 2006 . . .[,]" "Jim's visual field is significantly compromised to the extent that he has less than 20 degrees of fixation from his visual field[,]" "He's looking through a straw[,]" "his *left eye* is legally blind on the basis of his compromised visual field to within 20 degrees – to less than 20 degrees of fixation."  (R. at 19, 51-52 (emphasis added).)

- Dr. Siegel's June 17, 2013 testimony that "[a]s an ophthalmologist and glaucoma specialist, we don't look at patients and go well you have a 15 degree field loss, or you have 20 degree, you have a 30 degree visual field loss. . . . It isn't the way it's clinically done in practice."  (R. at 20, 52-53.)

- Dr. Taub's June 17, 2013 testimony that, Plaintiff did not meet a Listing in 2006.  (*See* R. at 19, 56-57.)

(R. at 19-20.)

In support of his argument that he is legally blind as defined by the second sentence of 42 U.S.C. § 1382c(a)(2) (or Listing 2.03A), Plaintiff points out that Dr. Herndon stated in an affidavit that Plaintiff is "legally blind within the definition of the Internal Revenue Code," and that "the Internal Revenue Code definition of blindness in 26 U.S.C. [§] 63(f)(4) is <u>identical</u> to the Social Security Act definition in 42 U.S.C. [§] 1382[c](a)(2)[.]"  (DE 10 at 21 (emphasis in original); *see also* DE 10 at 23, DE 14 at 3-4.)  In a similar vein, Plaintiff draws the Court's attention to the White House's and Department of Justice's considerations of Plaintiff's blindness in connection with President George W. Bush's decision to commute his federal prison sentence.  (R. at 218-219, 422, DE 10 at 4, 24, DE 18 at 3.)

11

Nonetheless, the SSA listings criteria provide that only certain tests are acceptable to satisfy Listing 2.03A, and, at least at the time of the November 4, 2016 hearing before me, it was unclear to the Court whether any tests in the administrative record dated on or before December 31, 2006 were conducted under one of the acceptable tests.

In this regard, I permitted the parties to submit short, supplemental briefs in an attempt to illuminate this issue *limited to* the currently-standing administrative record. According to Plaintiff, Dr. Siegel ran 18 tests from February 3, 2009 through November 1, 2016 – either by the HFA 24-2 test or the HFA 10-2 test, only 4 of which appear on the record – the February 3, 2009 Central 24-2 Threshold Tests of the right and left eyes (R. at 409-410; *see also* R. at 405-406, 408, 479, 481) and the November 17, 2009 Central 24-2 Threshold Tests of the right and left eyes (R. at 426-427, 451-452, 485-486). (DE 18 at 1-2.)

### a.    The ambit of the record

In an addendum to his supplemental brief, Plaintiff points to a supposed discrepancy in the exhibits presented at the June 1, 2010 hearing versus the June 17, 2013 hearing. (DE 19 at 1.) In particular, Plaintiff contends that Dr. Siegel's September 21, 1999 test and two January 14, 2003 tests - each of which pre-dated December 31, 2006, was allegedly performed using the HFA 24-2 test and allegedly revealed an "angle of fixation in the visual field at less than 20

degrees[,]" - were in the record at the June 1, 2010 hearing but were not in the record at the June 17, 2013 hearing. (DE 19 at 2.) However, as best the Court can tell, at the time of the June 1, 2010 hearing, the Administrative Record included up to Ex. 11F. (R. at 74.) By comparison, while there was some conversation at the June 17, 2013 hearing regarding lost records from Duke University – perhaps those of Dr. Herndon (*see* R. at 45-47), Dr. Taub acknowledged review of Exhibits 1F through 12F (R. at 56; *see also* R. at 63-64, 65-66), and Exhibit 13F was part of the record (R. at 36, 37). Moreover, at the time of his April 15, 2014 decision, Judge Grippo had before him Exhibits 1F through 16F. (R. at 31-32.)[6] In other words, it appears that each of the medical exhibits available at the earlier hearing were part of the record at the later hearing and that, in between the two hearings, Exhibits 12F, 13F, 14F, 15F and 16F were *added*.

### b.     The method of testing

Based upon the current administrative record, the Court should agree with Defendant that Plaintiff "has failed to point to *record evidence* that he was statutorily blind before December 31, 2006[,]" and "has not pointed to *acceptable*

---

[6] As noted earlier, Exhibits 1F-16F comprise 127 pages of medical records. (R. at 31-32, 374-500.) Unfortunately, Judge Grippo's October 5, 2010 decision is not accompanied by a paged-listing of Exhibits 1F to 11F; therefore, the Court can only assume, based upon the current administrative record, that Exhibits 1F-11F at the initial hearing and decision were the same as Exhibits 1F-11F at the subsequent hearing and decision.

medical testing satisfying the criteria of Listing 2.03A before his date last insured .
. . ." (DE 20 at 1-2 (emphases added).)

At the June 17, 2013 hearing, the ALJ gave Plaintiff the opportunity to
"submit a post-hearing memorandum [to] show which exhibits Dr. Siegel is relying
on in forming his opinion[.]" (*See* R. at 60.)[7] At the November 4, 2016 hearing
held in this Court, I specifically asked counsel to point to any page of the
administrative record that would establish that Plaintiff met the criteria for
blindness under Listing 2.03A on or before December 31, 2006 based upon testing
methods recognized in the regulations, or, to put it differently, approved by the
SSA. His counsel could point to no such record. When given the further
opportunity to examine the entire record and answer the same question in a
supplemental brief, he was again unable to do so. (*See* DEs 18, 19.)

### c.       The date last insured

---

[7] This appears to have occurred on July 15, 2013, at which time Plaintiff's counsel
described 56 pages allegedly missing from the record. (R. at 360-361.) Although
the Court cannot account for each of these 56 pages, some of those described are
part of the current administrative record, such as Dr. Young's December 19, 2001
letter (R. at 379, 444, 462) and Plaintiff's counsel's May 13, 2010 letter to ALJ
Grippo (R. at 314-315, 454-455, 496-497). In any case, Plaintiff has not asserted
"missing records" as a basis for appeal here, and, as Plaintiff acknowledges in his
November 21, 2016 filing (DE 19 at 2), the submission here of Humphrey Field
Analyzer (HFA) 24-2 tests performed on January 14, 2003 and September 21,
2009 would exceed the scope of my November 4, 2016 directive regarding
supplemental briefing.

Furthermore, tests performed after December 31, 2006 do not show that Plaintiff's left eye condition met the listing on the date last insured.  For example, the ALJ acknowledged that two tests were performed with a "Central 24-2 Threshold Test," and explained that "the February 3 and November 17, 2009, visual field tests do not show the claimant's visual field over a longitudinal history extending back to December 31, 2006."  (R. at 20, 405-406, 408, 409-410, 426-427, 451-452, 479, 481, 485-486; *see also* R. at 24-25, 57, 67, 91.)  Also, the May 11, 2010 assessment was performed using a "full field 120 point screening test," (R. at 430-431, 493-494); not only does this test post-date December 31, 2006, but such a test is also explicitly unacceptable under the listings.  *See* Listing 2.00A6f.

Finally, an additional note is warranted about establishing Plaintiff's pre-December 31, 2006 condition with evidence from his treating physicians that post-dates the date last insured.  In his supplemental brief, Plaintiff acknowledges that the February 3, 2009 and November 17, 2009 tests post-date December 31, 2006; however, he points, in part, to:  **(a)** Dr. Herndon's September 28, 2009 statement that Plaintiff "met all criteria for legal blindness as early as December 31, 2006[,]" (R. at 420, 447, 483), and **(b)** Dr. Siegel's June 17, 2013 testimony that Plaintiff's condition was "certainly no better" in December 2006 than at the time of the hearing (R. at 50).  (DE 10 at 10, 23; DE 18 at 2.)  Still, neither of these statements identifies the method of testing or the criteria used to test Plaintiff's left eye visual

15

field loss before the date last insured.[8]  Moreover, the ALJ asked Dr. Siegel about

"*contemporaneous*, objective medical evidence dated on or before" the date last

insured (R. at 54 (emphasis added)), and medical expert Dr. Taub testified that he

reviewed Exhibits 1F through 12F and that the *first time* Plaintiff met a listing

"was on February 3, 2009[,]" (R. at 56-57).  Therefore, it is clear the ALJ was

persuaded by the timing of this evidence.  (*See also* R. at 19.)

　　　In sum, the tests which predate Plaintiff's date last insured do not appear to

establish measurement of visual field loss by a testing method acceptable under

Listing 2.00A6f, and the tests which postdate December 31, 2006 would not be

evidence that Plaintiff met the listing on his date last insured.  Based on the

administrative record, Plaintiff has not shown by reference to *acceptable* medical

testing that he satisfied the criteria of Listing 2.03A before his date last insured.

Thus, he has not met his relative burden.  *See Jones v. Comm'r of Soc. Sec.*, 336

F.3d 469, 474 (6th Cir. 2003) ("Through step four, the claimant bears the burden of

proving the existence and severity of limitations caused by her impairments and

the fact that she is precluded from performing her past relevant work . . . .").  The

---

[8] As the Commissioner argues, Plaintiff's reliance on *Bird v. Commissioner of Soc. Admin.*, 699 F.3d 337 (4th Cir. 2012) is unavailing.  (DE 18 at 2-3, DE 20 at 2.)  First, it is not binding on this Court.  Second, it is not a listings case.  *Bird*, 699 F.3d at 345.  Third, unlike the ALJ in *Bird*, the ALJ in the instant case *did* consider medical evidence post-dating the date last insured but concluded, "the February 3 and November 17, 2009, visual field tests do not show the claimant's visual field over a longitudinal history extending back to December 31, 2006."  (R. at 20.)

SSA, through its regulations, is entitled to set the criteria for which methods and criteria will or will not be used to determine blindness for purposes of establishing an entitlement to benefits. 20 C.F.R. §§ 404.1504, 416.904 ("A decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency that you are disabled or blind is not binding on us."). Notwithstanding Plaintiff's suggestion that a finding of blindness by the IRS could somehow be controlling – by an agency that is hardly known for its expertise in determining disabilities – the SSA is authorized to make an independent determination under its own, unique regulatory scheme. *See, e.g., Ritchie v. Comm'r of Soc. Sec.*, 540 Fed. App'x 508, 510 (6th Cir. 2013) ("The administrative law judge was not bound to accept the disability rating made by the Veterans Administration.")

> ### 2.   The ALJ properly evaluated the opinion evidence in determining that the vision in Plaintiff's left eye does not meet Listing 2.03A.

Plaintiff takes issue with the ALJ's treatment of the opinion evidence, seemingly the assignment of "great weight" to the opinions of Dr. Taub and "little weight" or "no weight" to the opinions of Dr. Siegel and Dr. Herndon. (*See* DE 10

at 26-27; *see also* DE 14, R. at 18-26.)  The Commissioner argues that "[t]he ALJ properly weighed the treating source opinions[.]"  (DE 12 at 17-23.)

An ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. §§ 404.1527(b), 416.927(b). "Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists."  20 CFR §§ 404.1527(e)(2)(i), 416.927(e)(2)(i).  The ALJ must, however, "consider findings and other opinions" of State Agency medical or psychological consultants.

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). To qualify as a treating source, the physician must have an "ongoing treatment relationship" with the claimant.  20 C.F.R. §§ 404.1502, 416.902.

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements.[9] *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.*

Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The United States Court of

---

[9] An exception exists for treating source opinions on issues that are reserved to the Commissioner, which "are never entitled to controlling weight or special significance." S.S.R. 96-5p, 61 FR 34471-0, at *34473. Examples of issues reserved to the Commissioner include:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
> 2. What an individual's RFC is;
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
> 4. How the vocational factors of age, education, and work experience apply; and
> 5. Whether an individual is "disabled" under the Act.

*Id.*

Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45.  Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 312 F. A'ppx 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

### a.       Leon Herndon, M.D. (treating physician)

The ALJ made express assignments of weight to several of Dr. Herndon's opinions, at least four of which Plaintiff specifically refers to in support of his argument that he "was legally blind within the statutory definition of 42 U.S.C. [§] 1382[c](a)(2) well before December 31, 2006."  (*See* DE 10 at 21-24.)  The Court will address these opinions, and the weight assigned to each, in chronological order.

*First*, the ALJ assigned "little weight" to the April 24, 2001 opinion of Dr. Herndon (R. at 378, 443), explaining:

> In a letter dated [April 24], 2001, Dr. Herndon opined that the claimant was "significantly disabled due to his glaucoma and would qualify as legally blind given his level of visual acuity and visual field defects." ([R. at 378, 443]). However, this opinion deserves little weight because it is *vague* and *conclusory*. The determination of whether the claimant is "disabled" is *reserved to the Commissioner*. Furthermore, Dr. Herndon wrote that the claimant's visual acuity was 20/100 with best correction in the better left eye, which falls short of the definition of statutory blindness set forth by the Social Security Act. ([*Id*.]). Furthermore, Dr. Herndon cited no clinical findings or tests to establish the loss of visual field, as required for a finding of statutory blindness under the Social Security Act.

(R. at 23 (emphases added).) Here, the ALJ permissibly discounted this opinion on the bases of supportability and that it regarded an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(c)(3),(d), 416.927(c)(3),(d); *see also Cosma v. Comm'r of Soc. Sec.*, 652 F. App'x 310, 311 (6th Cir. 2016) ("The ALJ reasonably gave no weight to Dr. Dhar's opinion because her conclusion that Cosma is totally disabled is a determination reserved to the Commissioner . . . ."). Moreover, this opinion demonstrates Dr. Herndon's unfamiliarity with the definition of blindness in this context.

*Second*, the ALJ assigned "no weight" to the February 19, 2002 affidavit of Dr. Herndon (R. at 376-377, 445, 463-464), stating:

> Exactly *two months before* signing his affidavit, Dr. Herndon wrote to the claimant's attorney and specifically stated that the claimant's best-corrected vision in the better left eye was 20/l00 with correction, which is completely at odds with the IRS [Internal Revenue Service] definition of statutory blindness requiring visual acuity of 20/200 or less. (2F at 3 [R. at 378]). Furthermore, the record contains no visual field tests prior to date of this affidavit. As noted above in Finding 4,

21

the first visual field tests in the record are dated February 3 and
November 17, 2009, which is well after the date of this opinion by Dr.
Herndon.  (4F at 8-9 [R. at 409-410; *see also* R. at 405-406, 408, 479,
481]; 12F at 13-14 [R. at 451-452; *see also* R. at 426-427, 485-486]).

(R. at 24 (emphasis added).)[10]  Thus, the ALJ permissibly noted an

inconsistency in Dr. Herndon's opinions of April 24, 2001 and February 19,

2002 and discounted the opinion on this basis.  20 C.F.R. §§

404.1527(c),(4), 416.927(c),(4).

> *Third*, the ALJ assigned "very little weight" to Dr. Herndon's

September 28, 2009 letter (R. at 420, 447, 483):

> After due consideration, the undersigned gives very little weight to
> Dr. Herndon' s September 28, 2009, opinion because it is *not well
> supported* and *not consistent* with the record as a whole.  Statutory
> blindness as defined by the Social Security Act requires corrected
> visual acuity of 20/200 in the better eye, or a visual field of 20 percent
> or less established by acceptable perimetry test results.  The medical
> evidence cited by Dr. Herndon in support of his opinion, namely
> visual acuity of 20/40 in the better eye and less than 60 degrees of
> visual field, does not satisfy the requirements of statutory blindness
> (i.e., listings 2.02 and 2.03A) as set forth in the Social Security Act.
> Furthermore, the record contains no visual field test results from Dr.
> Herndon or any other physician prior to December 31, 2006.  (1F-3F;
> 6F).  The first visual field tests of record were completed on February
> 3 and November 17, 2009.  (4F at 8-9 [R. at 409-410; *see also* R. at

---

[10] To be sure, the ALJ's timing is wrong, because he incorrectly cited Herndon's
April 24, 2001 letter as having been dated December 19, 2001 (which is actually a
letter by Timothy N. Young, M.D., Ph.D., of North Carolina Eye & Ear Clinics).
(*Compare* R. at 23, 378-379, 443-444; *see also* R. at 462.)  However, even
considering that Dr. Herndon's letter was signed approximately *ten months before*
signing his affidavit, it remains that he listed the visual acuity in Plaintiff's left eye
as "20/100."  (R. at 378, 443.)

> 405-406, 408, 479, 481]; 12F at 13-14 [R. at 451-452; *see also* R. at
> 426-427, 485-486]). The statement that the claimant's visual field was
> "less than a total of 60 degrees" is simply too vague with respect to
> listing 2.03A. Dr. Herndon did not specify what type of visual field
> test he performed (e.g., screening test, HFA 24-2, HFA 30-2), and
> did not specify if the visual field loss was in the right eye, the better
> left eye, or both. Additionally, the undersigned notes that Dr.
> Herndon had not *treated* the claimant for several years prior to
> rendering this opinion.

(R. at 24 (emphases added); *see also* R. at 20-21.) Here, the ALJ considered the

treatment relationship, supportability and consistency factors. 20 C.F.R. §§

404.1527(c)(2),(3),(4), 416.927(c)(2),(3),(4).

*Fourth*, the ALJ assigned "very little weight" to Dr. Herndon's May 3, 2010

opinion (R. at 432, 453, 490):

> The undersigned gives very little weight to Dr. Herndon's May 2,
> 2010, opinion statement because it *lacks support* in the medical
> record. The record does not contain any visual field studies conducted
> by Dr. Herndon or any other physician prior to December 31, 2006.
> (lF; 2F; 3F; 6F). The first visual field studies of record were done by
> Dr. Siegel on February 3, 2009. (4F at 8-9 [R. at 409-410; *see also* R.
> at 405-406, 408, 479, 481]). The undersigned also notes that Dr.
> Herndon did not specify what type of visual field test he performed
> *(e.g.,* screening test, HFA 24-2, HFA 30-2), and did not specify if the
> visual field loss was in the right eye, the better left eye, or both. Dr.
> Herndon provided no definition of the term "severe" as he used it.

(R. at 25 (emphasis added).) Here, too, the ALJ permissibly discounted this

opinion on the basis of supportability. 20 C.F.R. §§ 404.1527(c)(3),

416.927(c),(3). At the same time, the ALJ assigned "greater weight" to Dr.

Herndon's *contemporaneous* treatment notes:

> Furthermore, Dr. Herndon' s *contemporaneous* treatment notes, which were completed just prior to December 31, 2006, do not reference any prior visual field testing or any deficits in the claimant's visual field. (1F-3F [R. at 374-401]).  In comparison, the undersigned gives greater weight to Dr. Herndon's *contemporaneous* notes, which were prepared for his own use in treating a patient, than to his later opinion statements.

(R. at 25 (emphases added).)  Based on an earlier reference to "*contemporaneous* medical evidence of record," (R. at 18 (emphasis added)), the Court assumes the ALJ is referring to the following records dated just prior to December 31, 2006, such as Duke University Hospital or Dr. Herndon's notes from July 18, 2006 (R. at 397, 470), August 22, 2006 (R. at 392-393, 474-475), September 5, 2006 (R. at 394, 467) and October 19, 2006 (R. at 390).  Thus, the ALJ permissibly credited (or discredited) Dr. Herndon's/Duke University's treatment notes on the basis of their proximity in time to Plaintiff's date last insured and the other factors identified above.

### b.      Leslie Siegel, M.D. (treating physician)

The ALJ also made express assignments of weight to two of Dr. Siegel's opinions.  Having earlier acknowledged that Dr. Siegel was a treating physician, the ALJ assigned "very little weight" to Dr. Siegel's October 27, 2009 opinion. (R. at 19, 25, 423, 449, 484.)  In so doing, the ALJ explained:

> *First*, Dr. Siegel's opinions that the claimant is "disabled" and could not be "gainfully employed" are *vague* and *conclusory*.  The determination of disability is *reserved to the Commissioner*.  *Second*, the February 3, 2009 visual field test represents a snapshot of the

24

> claimant's vision at that point in time only. (4F at 8-9 [R. at 409-410; *see also* R. at 405-406, 408, 479, 481]). The record shows no other visual field tests prior to the date of this opinion. *Third*, Dr. Siegel stated that the claimant had "severe loss of his peripheral vision" but did not cite any evidence that the claimant's visual field was in fact 20 percent or less as required by 2.03A. (7F at 1 [R. at 423]). Dr. Siegel did not provide a definition for the term "severe"" as he used it in this letter. Dr. Siegel's October 2009 opinion statement does not reflect the claimant's level of vision prior to December 31, 2006. *Overall*, Dr. Siegel's opinion is *not well supported* and *not consistent* with the record as a whole.

(R. at 25 (emphases added).) Here, the ALJ permissibly discounted this opinion on the bases of the treatment relationship, supportability and consistency, as well as on the basis that it concerned an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(c)(2),(3),(4),(d), 416.927(c)(2),(3),(4), (d). Also, the ALJ assigned "very little weight" to Dr. Siegel's May 11, 2010 opinion. (R. at 20, 430-431, 458, 493-494). In so doing, the ALJ noted that it was "based upon a visual field screening test . . . ." (R. at 20.) As noted above, these tests are expressly excluded from the acceptable methods of measuring visual field loss. Thus, the ALJ discounted this piece of evidence on the basis of supportability. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).

In addition to these express assignments of weight, the ALJ made some implied assignments of weight to Dr. Siegel's opinions. For example, the ALJ noted that Dr. Siegel's inability at the June 17, 2013 hearing to identify any specific visual field tests which pre-date the December 31, 2006 date last insured

2:15-cv-13435-NGE-APP  Doc # 21  Filed 12/20/16  Pg 26 of 32  Pg ID 648

"detracts from his opinion that the severity of the alleged vision loss met the criteria of listing 2.03A as of that date." (R. at 20, 53; *see also* R. at 19, R. at 50-51, 54.) Here, too, the ALJ considered the supportability and consistency of Dr. Siegel's testimony. 20 C.F.R. §§ 404.1527(c)(3),(4), 416.927(c)(3),(4).

In addition, although not making an express assignment of weight, the ALJ commented upon Dr. Siegel's January 9, 2014 letter. (R. at 500.) In so doing, the ALJ explained:

> While there is no reason to doubt what Dr. Siegel says in this report, it must again be emphasized that (1) the report says nothing about the claimant's condition on or before December 31, 2006, which is the last date on which he was fully insured for purposes of statutory blindness; and (2) it does not, even with respect to the current time, describe a condition that meets the definition of statutory blindness because it fails to state whether the visual acuity is with best correction. This opinion therefore, is not probative of the issue of statutory blindness on or before December 31, 2006.

(R. at 25-26.) Thus, even in the absence of an express assignment of weight as to this post-hearing letter, it is clear the ALJ considered its supportability. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).

In sum, the ALJ appropriately discounted these three opinions. To be sure, Plaintiff specifically contends:

> The significance of the November 30, 2010 letter from Dr. Siegel [to Plaintiff's counsel] ([R. at] 439), expressing his <u>astonishment</u> at the decision and concluding that '<u>This decision is simply wrong and needs to be rectified</u>' cannot be overemphasized. Dr. Siegel has told us that Jim Harris' disability for blindness has been clear as a bell

26

since he was seen in 1996 by Dr. Sayoka Moroi at the University of Michigan.

(DE 10 at 18-19 (emphasis in original).)[11]  Nonetheless, similar to the ALJ's treatment of Dr. Siegel's October 27, 2009 opinion as opining on an issue reserved to the Commissioner (*see* R. at 25), the same would be true of Dr. Siegel's November 30, 2010 statement, "I have no idea whatsoever, why there would be any reason to deny Mr. Harris his disability."  (R. at 439; 20 C.F.R. §§ 404.1527(d), 416.927(d).)  Stated otherwise, even though the ALJ did not expressly mention Dr. Siegel's November 30, 2010 letter (R. at 439), it does not operate to "undo" the ALJ's proper discounting of several of Dr. Siegel's other opinions and sheds no further light on what legally mandated visual field tests were or were not performed before December 31, 2006 - the date last insured.  Any error in failing to expressly mention it, if at all, was harmless.

### c.    Dr. Taub (medical expert)

The ALJ assigned "great weight" to Dr. Taub's June 17, 2013 testimony. (R. at 19-20, 56-70.)  Having earlier acknowledged that Dr. Taub was "an impartial medical expert," the ALJ specifically noted that Dr. Taub was "on the roster of medical experts compiled by the [SSA], and has experience evaluating matters of visual field loss under listing 2.03A."  (R. at 14, 17, 19.)  Thus, the ALJ considered

---

[11] Plaintiff alleges Dr. Siegel made this representation in December 2010.  (*See* R. at 324, 332.)

Dr. Taub's treatment relationship (or lack thereof) and his area of specialization. 20 C.F.R. §§ 404.1527(c)(2),(5), 416,927(c)(2),(5).

Moreover, the ALJ explained that "the record does not contain any visual field testing that measures the central 24 to 30 degrees of claimant's visual field prior to December 31, 2006." (R. at 20). Finally, I note that the ALJ considered the difference in Drs. Taub and Siegel's hearing testimony as to "whether the severity of the claimant's vision loss met the criteria of listing 2.03A prior to December 31, 2006." (R. at 19; *see also* R. at 50, 57.) Thus, the ALJ considered the supportability and consistency of Dr. Taub's opinion. 20 C.F.R. §§ 404.1527(c)(3),(4), 416.927(c)(3),(4).

Plaintiff contends that Dr. Taub neither met nor saw Plaintiff. (DE 10 at 27.) However, this fact, alone, does not prevent the ALJ from considering Dr. Taub's opinion. "[T]he treating physician's opinion is entitled to controlling weight only when the medical opinion is not inconsistent with the other substantial evidence in the record." *Wilson v. Halter*, 23 F.App'x 341 (6th Cir. 2001) (citing *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 530 (6th Cir.1997)); *see also Norris v. Commissioner of Soc. Sec.*, 461 F.App'x 433, 439 (6th Cir. 2012) ("Any record opinion, even that of a treating source, may be rejected by the ALJ when the source's opinion is not well supported by medical diagnostics or if it is inconsistent with the record."). Here, on the issue of whether the condition of Plaintiff's left

eye met Listing 2.03A on December 31, 2006, it is clear that the ALJ appropriately discounted the opinion(s) of treating physician Dr. Siegel on the bases of supportability and/or consistency (as discussed above) and, instead, favored the testimony of non-examining medical expert Dr. Taub.  Moreover, in this case, any assignment of weight to Dr. Taub's opinion is a red herring.  Even if the ALJ had rejected Dr. Taub's opinion, the ALJ would have been left with the opinions of Plaintiff's treating physicians, which, as noted above, do not establish that approved testing methods were utilized and were otherwise properly discounted.

### d.    The ALJ provided "good reasons" for his assignment of weight.

As noted above, the ALJ provided good reasons for the relative assignments of weight to the opinion evidence, referencing several of the factors contemplated by 20 C.F.R. §§ 404.1527, 416.927.  For this reason, the ALJ's express assignment of weight to the opinion(s) of Drs. Herndon, Siegel and Taub should be left undisturbed.

### G.    Conclusion

Plaintiff argues that "this is in no way a close case."  (DE 10 at 27, DE 14 at 5, DE 18 at 3.)  I disagree.  Perhaps it is a "tough case," because the Court does not doubt Plaintiff's present blindness (*see* DE 10 at 26), nor does the Court necessarily doubt the genuinely held, if vague, opinions of Plaintiff's treating physicians.  Nonetheless, a case that "tugs at the heartstrings" is not necessarily

29

equivalent to one that mandates an award of benefits under the SSA.  Instead, given the lack of *acceptable* evidence that the vision in Plaintiff's left eye met Listing 2.03A as of December 31, 2006, the law compels me to conclude that:  **(a)** substantial evidence supports the ALJ's conclusion; and **(b)** the ALJ properly evaluated the opinion evidence.  As for Plaintiff's alternative request that the case be remanded for a third hearing before a different ALJ (*see* DE 18 at 4), Plaintiff has had two hearings before the same ALJ, and yet has failed at either hearing to make a record which would satisfy the requirements of Listing 2.03A, even when given two opportunities to examine his treating physician.  (R. at 39-54, 68.)  This is so, because the record is devoid of any acceptable visual field tests which pre-date the date last insured.  A third bite at the apple is not warranted.

Accordingly, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary judgment as modified at the November 4, 2016 hearing (DE 10), **GRANT** Defendant's motion for summary judgment (DE 12), and **AFFIRM** the Commissioner of Social Security's decision.

## III.    PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right

of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: December 20, 2016                    s/Anthony P. Patti
                                            Anthony P. Patti
                                            UNITED STATES MAGISTRATE JUDGE

I hereby certify that a copy of the foregoing document was sent to parties of record on December 20, 2016, electronically and/or by U.S. Mail.

s/Michael Williams
Case Manager for the
Honorable Anthony P. Patti